UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAZMIN VAZQUEZ, on behalf of J.V.,

                Plaintiff,

       v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

DECISION & ORDER

13-CV-6372P

## PRELIMINARY STATEMENT

Plaintiff Jazmin Vazquez ("Vazquez" or "plaintiff") brings this action on behalf of her minor son ("J.V.") pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 13).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 11, 12). For the reasons set forth below, I hereby vacate the decision of the Commissioner, and this claim is remanded solely for the calculation and payment of benefits.

## BACKGROUND

### I.    Procedural Background

On September 28, 2007, plaintiff protectively filed an application for SSI benefits on behalf of J.V. (Tr. 221-23, 244).[1] On January 10, 2008, the Social Security Administration denied the application for benefits, finding that J.V. was not disabled.[2] (Tr. 92-95). Plaintiff requested a hearing before an administrative law judge, and the claim for benefits was dismissed on October 6, 2009, after plaintiff and J.V. failed to appear at the scheduled hearing. (Tr. 78-84, 98-105). On June 22, 2010, the Appeals Council remanded the claim for further proceedings, determining that the hearing notices had been sent to the wrong address. (Tr. 87-88).

While the previous claim was pending before the Appeals Council, on March 1, 2010, plaintiff filed another application for SSI benefits on J.V.'s behalf alleging disability due to Attention Deficit Hyperactivity Disorder ("ADHD") and aggression. (Tr. 226-29, 277). On April 20, 2010, the Social Security Administration denied the application for benefits, finding that J.V. was not disabled. (Tr. 85). Plaintiff requested and was granted a hearing before Administrative Law Judge David S. Lewandowski (the "ALJ"). (Tr. 49, 179-83). The ALJ conducted a hearing on the pending applications on August 23, 2011, during which J.V. was represented by his attorney, Katherine Courtney, Esq. (Tr. 28-67, 176). In a decision dated October 26, 2011, the ALJ found that J.V. was not disabled and was not entitled to benefits. (Tr. 29-42).

On June 26, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-7). In the denial, the Appeals Council noted that it had considered medical records from Genesee Mental Health Center dated through March 3, 2011. (Tr. 2, 5).

---

[1] The administrative transcript shall be referred to as "Tr. ___."

[2] J.V.'s previous application for SSI had been denied on March 6, 2007. (Tr. 245).

The Appeals Council declined to consider an undated teacher evaluation and records from the

Rochester City School District that post-date the ALJ's determination.  (Tr. 2).  Plaintiff

commenced this action on July 17, 2013, seeking review of the Commissioner's decision.

(Docket # 1).

## II.     <u>Non-Medical Evidence</u>

### A.     <u>Application for Benefits</u>

J.V. was born in 1998 and is now sixteen years old.  (Tr. 244).  Vazquez reported

that J.V. has difficulty seeing and wears glasses or contact lenses, but has no difficulty hearing

and does not suffer from any physical limitations.  (Tr. 267, 271).  According to Vazquez, J.V.'s

ability to communicate is limited; as examples, she noted that he is unable to deliver phone

messages, repeat stories, tell jokes or riddles accurately, or explain why he did something.

(Tr. 269).  J.V. reportedly cannot read capital or small letters of the alphabet, read and

understand stories, spell most three or four letter words, write a simple story with six or seven

sentences, or make correct change using money.  (Tr. 270).  Additionally, Vazquez reported that

J.V. does not have friends his own age and has difficulty making new friends, noting that he likes

to spend time with children who are older than he is.  (Tr. 272).

Vazquez reported that J.V. has difficulty picking up his toys, hanging up his

clothes, helping with household chores and accepting criticism or correction.  (Tr. 273).

According to Vazquez, J.V. needs repeated reminders about his responsibilities and responds

with an attitude when corrected or told what to do.  (*Id.*).  According to Vazquez, J.V. is not able

to stay busy on his own, finish projects or complete his chores.  (Tr. 274).  Vazquez reported that

J.V. becomes frustrated with homework and needs one-on-one attention and assistance in order to complete it. (*Id.*).

      **B.**      **Academic Evidence (School Records and Teacher Questionnaires)**

          **1.**      **First Grade (2005-2006)**

School records indicate that J.V. scored well-below New York State standards in both mathematics and English language arts during first grade testing. (Tr. 375-77). His school records contain a letter from a nurse practitioner at Strong Pediatric Practice informing the school principal that J.V. had been diagnosed with ADHD and requesting that J.V. undergo a full psychological evaluation due to his below grade-level school performance. (Tr. 404). J.V. was referred to the Committee on Special Education ("CSE") for evaluation. (Tr. 399). J.V. underwent several evaluations, some of which are summarized herein. (Tr. 366).

Additionally, the school's educational staff provided input based upon their classroom observations of J.V. (Tr. 406-08). During an observation of classroom behavior, J.V. did not appear to understand the activity and did not raise his hand for assistance. (Tr. 406). Even after receiving assistance, J.V. needed additional, individualized cues and behavior management to remain on task. (*Id.*).

J.V.'s teacher indicated that J.V. was placed near the board and the teacher, and required repeated directions, feedback, physical prompts, cues and redirection throughout the school day. (Tr. 407). The teacher noted that J.V. completed his homework only some of the time and displayed poor motivation. (*Id.*). J.V.'s teacher opined that he had difficulty paying attention and needed simple, one-step directions to learn. (Tr. 408). According to J.V.'s teacher, J.V. worked best in a small group with constant support and few distractions. (*Id.*).

A psychosocial assessment conducted by Pamela Hall ("Hall"), LMSW, indicated that J.V. lives with his mother and younger brother, that his stepfather is incarcerated and that many of his relatives live in the Rochester area.  (Tr. 409-13).  According to the report, both Spanish, his mother's dominant language, and English, were spoken in J.V.'s household.  (*Id.*). According to the report, J.V. was diagnosed with ADHD when he was five years old and takes medication for it.  (*Id.*).  During the assessment, Vazquez indicated that J.V. had struggled at school for the previous three years and that he did not understand his school assignments.  (*Id.*). Hall did not recommend counseling for J.V., but referred Vazquez to Project Cope.  (*Id.*).

A speech and language assessment was conducted by speech and language pathologist Diane Bredes-Nies ("Bredes-Nies").  (Tr. 401-03, 05).  Assessment notes indicate that J.V. was referred for evaluation because he had demonstrated "severe off task behaviors" in kindergarten and because he was being considered for retention.  (*Id.*).  According to the notes, he lacked many skills that should have developed in kindergarten and demonstrated difficulty retaining information and adjusting to the structure and routines of the school day.  (*Id.*).  J.V. had been diagnosed with ADHD and treated with medication, which, according to his teacher, resulted in significant improvement in his attention skills.  (*Id.*).  J.V.'s teacher had instituted an additional behavior plan, which was effective.  (*Id.*).

Although J.V. failed an auditory examination in his left ear, his hearing was ultimately assessed to be within normal limits.  (*Id.*).  Bredes-Nies opined that J.V.'s speech was intelligible to the familiar and unfamiliar listener with or without known content.  (*Id.*). Similarly, his voice and fluency were assessed to be within normal limits.  (*Id.*).  With respect to J.V.'s language development, Bredes-Nies assessed him to be within the average range of performance for relational vocabulary, oral vocabulary and grammatical understanding, in the

mild delay deviation range of performance for picture vocabulary, grammatical completion and phonemic analysis, in the moderate deviation range for sentence imitation and in the severe deviation range for word discrimination.  (*Id.*).

Assessment notes indicate that J.V. is a multi-modal learner who performs better when permitted to move around within a designated area.  (*Id.*).  J.V. demonstrated some weakness in short-term memory skills and difficulty distinguishing between words that are similar.  (*Id.*).  Bredes-Nies did not recommend services for J.V.  (*Id.*).

The school evaluation concluded that J.V. demonstrated mild delays in overall language, borderline verbal skills, average spatial skills, and below level academic skills, falling in the pre-kindergarten to kindergarten level.  (Tr. 399).  The evaluation noted that J.V.'s frequent school absences could affect his school performance.  (*Id.*).  The CSE team recommended that J.V. be classified as Other Health Impaired ("OHI") or Learning Disabled ("LD") and recommended house pickup and an integrated special classroom.  (*Id.*).

## 2. <u>Second Grade (2006-2007)</u>

On April 30, 2007, J.V.'s IEP was reviewed to assess his educational needs for the 2007-2008 academic school year.  (Tr. 367-73).  According to the IEP, J.V. was classified as OHI and required house pickup due to his poor safety judgment in unstructured settings.  (*Id.*).  The IEP further noted that J.V. demonstrated a significant delay in attention skills, which adversely affected his performance.  (*Id.*).  The IEP suggested that J.V. learned best when instruction was given in a multisensory manner and when J.V. worked in small groups with one-on-one instruction.  (*Id.*).  J.V. demonstrated an ability to implement very basic reading strategies and with support could break down a story into a beginning, middle and end.  (*Id.*).

J.V. demonstrated strength in math.  (*Id.*).  According to the IEP, J.V. required re-teaching of

new material due to his difficulties recalling and applying new information.  (*Id.*).

The CSE recommended that J.V. continue to be classified as OHI, advance to the

third grade and receive education in a 15:1 integrated special class with modifications and testing

accommodations.  (*Id.*).  Specifically, J.V. was to be monitored to ensure that he understood

instructions and concepts, re-taught information, provided tasks broken into smaller segments

and provided with the use of graphic organizers.  (*Id.*).  Testing accommodations included

extended time, simplified, verbal directions and additional examples in directions, administration

of tests in a location with minimal distractions.  (*Id.*).  The CSE also recommended that

transportation services continue to be provided to J.V.  (*Id.*).

### 3.   Fourth Grade (2008-2009)

School records indicate that Hall conducted a psychosocial assessment of J.V. on

October 7, 2008.  (Tr. 581-84).  Hall's assessment indicates that J.V. continued to live with his

mother and younger brother and that he had extended family living in the Rochester area.  (*Id.*).

The assessment notes indicate that J.V. was attending weekly therapy sessions at Crestwood

Children's Center ("Crestwood").  (*Id.*).  Vazquez reported that J.V. continued to struggle

academically and expressed concern that J.V. had difficulty with reading comprehension.  (*Id.*).

On October 28, 2008, J.V.'s IEP was reevaluated.[3]  (Tr. 574-80).  The IEP

indicated that J.V.'s reading level was far below grade level, which affected all areas of his

---

[3]  The IEP review suggests that additional testing was administered to J.V. on October 3, 2008.  (Tr. 577).
The record does not contain an interpretation of the test results, although a review of J.V.'s scores on the Wechsler
Individual Achievement Test-II suggest that J.V. was performing at a first grade level in reading comprehension and
word reading, a second grade level in written expression and a third grade level in math reasoning.  *See Persley v.
Comm'r of Soc. Sec. Admin*, 2011 WL 4058985, *1 (N.D. Tex.) (noting that the Wechsler Individual Achievement
Test-Second Edition results estimate a child's grade-level performance for various subjects), *report and
recommendation adopted*, 2011 WL 4056177 (N.D. Tex. 2011).  Additionally, it appears that the Woodcock
Johnson III Tests of Cognitive Ability were administered at the same time.  (*Id.*).  Those tests results suggest that

instruction. (*Id.*). J.V. struggled with written expression, although he demonstrated strength in math. (*Id.*). J.V. demonstrated an ability to understand social studies and science content when presented orally. (*Id.*). According to the IEP, J.V. continued to struggle with focusing during academic periods, but was easily redirected and responded to simple cues. (*Id.*). The CSE determined that J.V. should continue to receive education in a 15:1 integrated special classroom setting, with the same modifications and testing accommodations. (*Id.*). Additionally, it was determined that J.V. should continue to be provided house pickup transportation. (*Id.*).

On April 14, 2009, J.V.'s IEP was reviewed to assess his educational needs for the 2009-2010 academic school year. (Tr. 565-73). The IEP noted that J.V.'s reading level continued to be well below grade level and that he continued to struggle with written expression. (*Id.*). J.V. continued to demonstrate strength in math and an ability to comprehend social studies and science material when presented orally. (*Id.*). According to the IEP, J.V. used his "Fusion" to help write simple sentences. (*Id.*). The IEP noted that J.V. had inconsistent peer relationships due to his sporadic behavior changes, problems with peer distractions and difficulty redirecting to task. (*Id.*). J.V. had difficulty working in a variety of groups. (*Id.*). Although J.V. was a "good worker," he demonstrated an awareness of his limitations that sometimes led to withdrawal and embarrassment. (*Id.*).

The CSE recommended that J.V. continue to be classified as OHI, advance to the fifth grade and receive education in a 15:1 integrated special class with modifications. (*Id.*). Specifically, J.V. was to be provided preferential seating, redirection, and the use of a graphic organizer. (*Id.*). Additionally, J.V. was to be provided a portable electronic note-taker, with text to speech, word prediction, and flash card reading capabilities, access to a desktop computer and

---

J.V.'s General Intellectual Ability was 83, with an 84 Verbal Ability, an 87 Thinking Ability and an 89 Processing Speed. (*Id.*).

printer to download written work, and books on tape with listening device access to digital text. (*Id.*).  The CSE also recommended that J.V. continue to receive the same testing accommodations, along with the use of a word processor with text to speech capability.  (*Id.*). Additionally, J.V. was recommended for continued house pickup transportation.  (*Id.*).

### 4.     Fifth Grade (2009-2010)

On March 24, 2010, J.V.'s IEP was reviewed to assess his educational needs for the 2010-2011 academic school year.  (Tr. 298-304).  J.V.'s IEP noted that he had participated in a Corrective Reading Program during the fifth grade.  (*Id.*).  According to the IEP, although J.V. had progressed, he was currently reading at an end-of-first-grade reading level.  (*Id.*).  J.V. continued to demonstrate strength in math and knew most of his multiplication tables, but he needed word problems read to him.  (*Id.*).  J.V. demonstrated good writing ideas and preferred to write without the assistance of a portable note-taker.  (*Id.*).  The IEP noted that J.V. was well-organized and neat about his work and that he was a gifted artist and participated in chorus. (*Id.*).  According to the IEP, J.V. was well-liked by his peers, was developing more appropriate relationships with adults and authority-figures, and had demonstrated improved behavior and attitude.  (*Id.*).  According to the IEP, J.V. continued to require refocusing and redirection to task and needed modification of his assignments to avoid frustration.  (*Id.*).

The CSE recommended that J.V. continue to be classified as OHI, advance to the sixth grade and receive education in a 15:1 integrated special class with modifications.  (*Id.*). J.V. was to be provided preferential seating, refocusing and redirection, the use of a graphic organizer, content and material read aloud, and a copy of class notes.  (*Id.*).  Additionally, J.V. was to be provided books on tape with listening device access to digital text.  (*Id.*).  With respect to testing accommodations, J.V. was to be provided extended time and additional examples in

directions, and tests and directions were to be read aloud and administered in a small group setting in a location with minimal distractions. (*Id.*).

### 5.   Sixth Grade (2010-2011)

On March 7, 2011, J.V.'s IEP was reviewed to assess his needs for the next academic school year. (Tr. 346-53). J.V.'s IEP noted that he continued to struggle with reading, although he had demonstrated some progress due to his participation in the Corrective Reading Program. (*Id.*). J.V. was reading at a Developmental Reading Assessment ("DRA") level of 28 and had begun the school year at a reading level of 18.[4] (*Id.*). J.V. continued to demonstrate strength in math, but continued to need word problems read to him. (*Id.*). J.V. was developing confidence as a writer and was "very accomplished artistically." (*Id.*). Again, the IEP noted that J.V. was well-liked by his peers, was developing more appropriate relationships with adults and authority-figures, and had demonstrated improved behavior and attitude. (*Id.*). According to the IEP, J.V. continued to require refocusing and redirection to task and needed modification of his assignments to avoid frustration. (*Id.*).

The CSE recommended that J.V. continue to be classified as OHI, advance to the seventh grade and receive integrated co-teaching services with modifications and testing accommodations. (*Id.*). Specifically, J.V. was to be provided preferential seating, refocusing and redirections and the use of a graphic organizer, and a copy of class notes. (*Id.*). With respect to testing accommodations, J.V. was to be provided extended time, additional examples in directions, simplified directions and repeated directions, and tests and directions were to be read aloud, and testing administered in a small group setting in a location with minimal

---

[4]  Vazquez maintains that a DRA score of 18 demonstrates the ability to read in the range of the end of first grade to the beginning of second grade, and a DRA score of 28 demonstrates the ability to read in the range of the end of second grade to the beginning of third grade. (Docket # 11-1 at 20 n.23).

distractions.  (*Id.*).  Additionally, it was determined that J.V. should continue to be provided

house pickup transportation.  (*Id.*).

### 6.  Teacher Questionnaires

On November 10, 2010, J.V.'s sixth grade special education teacher, Sally Riley

("Riley), completed a teacher questionnaire, reporting that she had known J.V. for one and

one-half years. (Tr. 338-45).  Riley indicated that J.V. was reading at a 1.5 grade level, that his

math skills were at a 2.5 grade level and that his writing skills were at a 2.0 grade level.  (*Id.*).

According to Riley, J.V. did not suffer from an unusual degree of absenteeism.  (*Id.*).  In the

domain of Acquiring and Using Information, Riley found that J.V. had very serious problems

comprehending oral instructions, understanding school content and vocabulary, reading and

comprehending written material, providing organized oral explanations and adequate

descriptions, expressing ideas in written form, learning new information, recalling and applying

previously learned material and applying problem-solving skills in class discussions.  (*Id.*).  In

addition, Riley found that J.V. had serious problems comprehending and doing math problems

and understanding and participating in class discussions.  (*Id.*).  Riley noted that J.V. always

required individual support to comprehend a new concept or to start a task.  (*Id.*).

In the domain of Attending and Completing Tasks, Riley indicated that J.V. had

very serious problems focusing long enough to finish an assigned activity or task, refocusing to

task when necessary, carrying out multi-step instructions, and changing from one activity to

another without being disruptive.  (*Id.*).  In addition, Riley assessed that J.V. had serious

problems paying attention when spoken to directly, carrying out single-step instructions, waiting

to take turns, completing assignments and completing work accurately without careless mistakes.

(*Id.*).  Further, Riley indicated that J.V. suffered from obvious problems sustaining attention

during activities, working without distracting himself or others, and working at a reasonable pace and finishing on time.  (*Id.*).  Finally, Riley noted that J.V. had a slight problem organizing his own things or school materials.  (*Id.*).

In the domain of Interacting and Relating with Others, Riley indicated that J.V. had serious problems following rules, respecting adults in authority, relating experiences and telling stories, using language appropriate to the situation, introducing and maintaining relevant and appropriate topics of conversation, taking turns in conversation, interpreting facial expression, body language, hints and sarcasm, and using adequate vocabulary and grammar to express ideas in general every-day conversation.  (*Id.*).  According to Riley, J.V. also demonstrated obvious problems playing cooperatively with other children, seeking attention appropriately, expressing anger appropriately and asking permission appropriately.  (*Id.*).  Riley opined that J.V. did not have any problems making and keeping friends.  (*Id.*).  According to Riley, she had to implement a behavior plan, revoke privileges and use time-outs to manage J.V.'s behavior and noted that he required a great deal of one-on-one assistance.  (*Id.*).  Riley indicated that J.V. experienced problems when in an unstructured environment.  (*Id.*).  Riley indicated that she could understand his speech one-half to two-thirds of the time.  (*Id.*).

Riley assessed that J.V. did not demonstrate any problems in the domain of Moving About and Manipulating Objects.  (*Id.*).  In the domain of Caring for Himself, Riley questioned whether he demonstrated a very serious problem cooperating or being responsible for taking his medication.  (*Id.*).  Riley further indicated that he demonstrated serious problems being patient when necessary, responding appropriately to changes in his own mood, and using appropriate coping skills to meet daily demands of the school environment.  (*Id.*).  Additionally, Riley indicated that J.V. had an obvious problem handling frustration appropriately and a slight

problem identifying and appropriately asserting emotional needs.  (*Id.*).  According to Riley, J.V. did not have any problems taking care of his personal hygiene, caring for his physical needs, using good judgment regarding personal safety and dangerous circumstances, or knowing when to ask for help.  (*Id.*).  Riley indicated that J.V.'s medication worked well, but that he did not take his medication on a regular basis and that J.V. was "extremely distracted" when he did not take his medication.  (*Id.*).

## III.   Relevant Medical Evidence[5]

### A.   Strong Memorial Hospital

Treatment notes indicate that J.V. received treatment through pediatric practices at Strong Memorial Hospital.  (Tr. 420-22).  On November 7, 2006, J.V. attended an appointment with Carol Hondorf ("Hondorf"), a nurse practitioner.  (*Id.*).  Treatment notes indicate that J.V. suffered from hyperactive behavior, but noted that his behavior had been better that year.  (*Id.*).  According to the notes, J.V. had previously demonstrated a problem with stealing and had set fire to a dresser in his mother's room.  (*Id.*).  J.V. was receiving mental health treatment at Crestwood.  (*Id.*).  Hondorf recommended that J.V. continue mental health treatment and his current medication regimen.  (*Id.*).

On June 12, 2007, J.V. returned for an appointment with Hondorf.  (Tr. 418-19).  During the appointment, Vazquez reported that J.V. would be entering the third grade and that his teachers reported that he required supervision and "hands-on follow-up to do well."  (*Id.*).  According to Vazquez, J.V.'s medication had been only partially beneficial.  (*Id.*).  Vazquez reported that J.V. was frequently angry, and she expressed concern that J.V. might hurt someone when he "loses control."  (*Id.*).  According to Vazquez, J.V. had "turned hot water" on his

---

[5]  Only those portions of the treatment records that are relevant to this decision are summarized herein.

younger brother when she had instructed him to get out of the bathtub.  (*Id.*).  Vazquez reported

that J.V. exhibited more frequent outbursts at home than at school.  (*Id.*).  According to Vazquez,

despite receiving mental health treatment at Crestwood, J.V. was not making progress in

managing his anger, and his therapist had recommended exploring an increase in medication.

(*Id.*).

       Hondorf considered whether J.V. might have a co-morbid condition that was not

being addressed and recommended that J.V. receive a psychiatric consult at Crestwood to

explore additional diagnosis, co-morbidity and potential medication modification.  (*Id.*).

### B.    **Crestwood Children's Center**

       Treatment records indicate that J.V. was referred by Hondorf for outpatient

treatment at Crestwood and was screened for treatment by Angela Bedford ("Bedford"), LMSW,

on July 19, 2006.  (Tr. 531-35).  According to the screening notes, J.V. was referred for

treatment due to his ADHD diagnosis, bedwetting, aggressive, impulsive and hyperactive

behavior, and trouble sleeping and relating to peers.  (*Id.*).  According to the notes, J.V. lived

with his mother, younger brother and stepfather.  (*Id.*).

       Upon examination, J.V. presented as happy and cooperative with a noted speech

impediment.  (*Id.*).  His affect was appropriate, his cognitive functioning was below average and

his insight and judgment were assessed to be poor and impulsive.  (*Id.*).  Bedford opined that J.V.

would benefit from outpatient therapy to improve his socialization skills and to work on ways to

manage his impulsivity and hyperactivity.  (*Id.*).  Bedford diagnosed J.V. with ADHD,

predominately Hyperactive-Impulsive, enuresis, and rule out anxiety disorder not otherwise

specified and mood disorder not otherwise specified.  (*Id.*).  She assessed a Global Assessment of

Functioning ("GAF") of 60 and recommended individual therapy and a psychiatric evaluation if necessary. (*Id.*).

Treatment notes indicate that J.V. received individual therapy from Thomas Cosad ("Cosad"), LCSW. (Tr. 492-510). An outpatient service plan review dated November 1, 2006 indicates that Vazquez reported that J.V. demonstrated problems listening. (Tr. 492-502). According to the review, transportation to scheduled appointments and cancelled appointments had presented an ongoing barrier to treatment. (*Id.*). J.V.'s GAF continued to be assessed at 60. (*Id.*).

J.V.'s treatment plan was reviewed again on September 27, 2007. (Tr. 503-09). The review notes indicate that J.V. was living with his mother, younger brother and stepfather. (*Id.*). Vazquez reported that J.V. had shown "marked improvement" in his behavior management, although he still presented an "attitude" at times. (*Id.*). The notes suggest that J.V. was doing well on his medication regimen and was performing satisfactorily at school. (*Id.*). The notes also indicate that Hondorf had requested a psychiatric consultation and medication evaluation due to Vazquez's reports that J.V. exhibited angry outbursts and rage. (*Id.*). Cosad recommended family therapy sessions every other week and a psychiatric consultation. (*Id.*).

On July 20, 2007, Rida Y. Rizk ("Rizk"), MD, conducted a psychiatric evaluation of J.V. (Tr. 536-40). Rizk noted that the psychiatric evaluation had been requested by J.V.'s primary care physician due to his episodes of rage. (*Id.*). According to Rizk, Hondorf had indicated that the ADHD treatment was not effective and she wanted to rule out bipolar disorder. (*Id.*). Rizk noted that Vazquez reported that J.V. engaged in "bad behavior," and Rizk noted a history of fire setting and antisocial behavior. (*Id.*). According to Vazquez, J.V. was hyperactive, continued to wet his bed and refused to obey directions. (*Id.*).

15

Upon examination, Rizk noted that J.V. demonstrated a cooperative attitude, good eye contact and that his motor activities were within normal limits. (*Id.*). According to Rizk, J.V.'s speech was very unclear, with a low tone of voice and very short answers. (*Id.*). J.V. demonstrated a good range in affect and mood swings. (*Id.*). According to Rizk, J.V.'s thought process appeared logical, coherent and relevant, and J.V. was able to follow directions of games, toys and artwork. (*Id.*). Rizk opined that J.V. did not demonstrate delusional thought content or formal thought disorder and demonstrated good impulse control. (*Id.*). She estimated that J.V.'s intelligence was low average to borderline. (*Id.*). Further, Rizk opined that J.V. did not demonstrate insight and that his judgment was impaired. (*Id.*).

Rizk diagnosed J.V. with ADHD, combined type, bipolar disorder not otherwise specified, oppositional defiant disorder, conduct disorder, childhood onset type and nocturnal enuresis. (*Id.*). Rizk assessed a GAF of 51. (*Id.*).

Treatment notes suggest that J.V.'s medication regimen was monitored throughout his treatment at Crestwood between July 2007 and January 2009. (Tr. 541-44). The treatment notes suggest that J.V. was generally doing well on his medication and at school, although he continued to experience "rage episodes," fights at school, difficulty reading and writing, continued bed-wetting and trouble sleeping. (*Id.*).

On February 18, 2009, J.V. was discharged from treatment at Crestwood. (Tr. 527-30). The discharge notes indicate that J.V. was transferred for therapy with a new social worker in August 2008, but never "fully engaged in treatment on a consistent basis." (*Id.*). According to the notes, contact with J.V.'s family was sporadic, and he frequently failed to attend therapy sessions and psychiatric appointments, causing J.V. to run out of his medications and impeding his progress towards his therapy goals. (*Id.*). The discharge notes suggest that

J.V. continued to perform poorly at school and was starting to demonstrate more problematic behaviors at home and school. (*Id.*). According to the notes, attempts to re-engage J.V. in treatment were unsuccessful. (*Id.*). At discharge, J.V. was diagnosed with ADHD, combined type, bipolar disorder not otherwise specified, oppositional defiant disorder, conduct disorder and childhood onset enuresis. (*Id.*). He was assessed a GAF of 51. (*Id.*).

    **C.**    **Genesee Mental Health Center**

Treatment notes indicate that J.V. was admitted to outpatient treatment at Genesee Mental Health Center ("GMHC") on March 27, 2009. (Tr. 587-89). On that date, J.V. was evaluated for treatment by Angela Kazmierczak ("Kazmierczak"), LMSW. (*Id.*). Treatment records indicate that J.V. was in the fourth grade and lived at home with his mother and brother. (*Id.*). Vazquez referred J.V. to treatment after having been discharged from treatment at Crestwood. (*Id.*). Vazquez reported that J.V. continued to anger easily, experience anxiety and was easily distracted. (*Id.*). Additionally Vazquez reported that J.V. would soon run out of his prescribed medications and needed a medication evaluation. (*Id.*).

J.V. reportedly had many friends and tended to spend time with older children, and enjoyed playing outside, visiting relatives, playing games and video games, watching television and playing with his toys. (*Id.*). According to Vazquez, J.V. had previously attempted to set fire to her dresser, but had no recent history of setting fires. (*Id.*).

Kazmierczak opined that J.V. would benefit from skills to assist him in controlling his emotions, impulse control and anger management, and a psychiatric evaluation to evaluate his medication regimen. (*Id.*). She opined that his prognosis was fair to good, contingent upon following through with treatment. (*Id.*). Kazmierczak diagnosed J.V. with

ADHD, combined by history and rule out mood disorder, not otherwise specified.  (*Id.*).  She assessed his GAF at 55.  (*Id.*).

Treatment notes suggest that J.V. received ongoing mental health treatment through therapy sessions with Kazmierczak between October 2009 and October 2010. (Tr. 590-604, 623-30).  During that time, J.V.'s medication regimen was monitored by a psychiatrist at GMHC.  (Tr. 593, 598).  Throughout that time period, J.V. continued to demonstrate hyperactivity, aggression, impulsivity, negative attitude and angry outbursts, although he demonstrated better behavior at school.  (Tr. 590-604, 623-30).  Kazmierczak noted that J.V. demonstrated inconsistent attendance at his scheduled appointments.  (Tr. 624).

On November 2, 2010, J.V. began therapy sessions with Kristen Rotundo ("Rotundo"), LMSW.  (Tr. 638-39).  During the session, Vazquez reported that J.V. had been doing better in school, although he continued to struggle with reading.  (*Id.*).  Vazquez also reported that J.V. continued to have emotional outbursts at home.  (*Id.*).  On November 16, 2010, J.V. and Vazquez attended another therapy session with Rotundo.  (Tr. 640).  During the session, Vazquez reported that J.V.'s behavior at school had improved, although he continued to display distractibility and hyperactivity at school and angry outbursts at home.  (*Id.*).  J.V. did not attend several scheduled appointments in December 2010.  (Tr. 642-47).

Treatment notes indicate that J.V. continued to attend therapy sessions and medication evaluation appointments between January and March 2011.  (Tr. 634-35, 648-57). During that time, Vazquez expressed concerns that J.V. demonstrated increasing physical aggression and defiance at home.  (*Id.*).  On May 13, 2011, J.V. and Vazquez attended a therapy session during which Vazquez reported that she had separated from J.V's stepfather and that he

had relocated to the New York City area.  (Tr. 631-33, 658).  Vazquez reported that J.V. had

been defiant and had been "bullying" his younger brother.  (*Id.*).

      Treatment notes from June and July 2011 indicate that J.V. continued to

demonstrate hyperactivity, minor aggression, impulsivity and a defiant attitude.  (Tr. 661-62).

      **D.**    **School Psychologist Evaluations**

      On May 16 and 19, 2005, Amanda Hine ("Hine"), MS, a school psychologist,

performed a psychological evaluation of J.V.  (Tr. 385-98).  At the time of the evaluation, J.V.

had been referred to the CSE at the request of his mother and doctor, who expressed concerns

regarding J.V.'s academic progress.  (*Id.*).

      Hine noted that J.V. was currently attending the first grade and that his

kindergarten report card demonstrated a knowledge of letters, letter sounds and numbers, but that

J.V. needed to practice identifying and writing letters, letter sounds and numbers.  (*Id.*).

According to Hine, J.V.'s mother had requested a CSE referral while J.V. was in kindergarten,

but the referral was deferred pending implementation of classroom interventions.  (*Id.*).  In

March 2005, J.V.'s doctor requested a full psychological evaluation to rule out a learning

disability because J.V. had demonstrated below grade-level performance and was at risk for a

learning disability given his ADHD diagnosis.  (*Id.*).

      According to Hine, J.V.'s first grade teacher assessed that J.V. was reading at a

kindergarten level and was performing at a kindergarten to early first grade level in math.  (*Id.*).

At the time, J.V. was receiving one-on-one instruction, differentiated class work and homework

and ESOL services.  (*Id.*).  J.V. demonstrated limited knowledge of letters and sounds and had

difficulty working independently and recognizing letters.  (*Id.*).  Hine noted that J.V. took his

prescribed ADHD medication inconsistently, which affected his ability to pay attention and

function.  (*Id.*).  According to Hine, when J.V. took his medication, he demonstrated high

motivation to complete his work, but when he did not, he exhibited off-task behaviors and a

tendency to hit and spit.  (*Id.*).  Hine recommended a CSE referral for the fall of 2005 and

assessed that J.V. would require additional support.  (*Id.*).

During the evaluation, J.V. was polite and cooperative, demonstrating high

motivation and task persistence, but required frequent repetition, simplification and clarification

of directions.  (*Id.*).  J.V. demonstrated that he was unable to identify some letters.  (*Id.*).

Hine administered a Wechsler Preschool & Primary Scale of Intelligence-Third

Edition test to J.V.  (*Id.*).  According to Hine, J.V. achieved a Verbal IQ of 78, a Performance IQ

of 100, a Processing Speed Index of 97, a General Language Composite of 86 and a Full Scale

IQ of 88.  (*Id.*).  Hine assessed that J.V.'s overall performance placed him in the low average

range, noting that his abilities could not adequately be captured by a single score.  (*Id.*).

According to Hine, J.V.'s nonverbal reasoning skills were significantly better developed than his

verbal comprehension and reasoning skills, noting that there was a twenty-two point range

between his Verbal Comprehension Index and the Perceptual Reasoning Index.  (*Id.*).

Hine also administered the Peabody Individual Achievement Test-Revised to

assess J.V.'s academic achievement.  (*Id.*).  The testing results indicated that J.V.'s academic

achievement ranged from very low to low average in all areas of testing.  (*Id.*).  J.V. was

performing at or below the kindergarten level in tested areas.  (*Id.*).  In addition, Hine

administered the Test of Auditory Processing Skills-Third Edition ("TAPS-3") to assess the

skills necessary for J.V. to develop, use and understand language commonly utilized in academic

and every day activities.  (*Id.*).  The results of the TAPS-3 testing demonstrated that J.V. ranged

between below average to severely delayed on all subtests and demonstrated low to very low

scores in memory and cohesion indices.  (*Id.*).  Hine opined that auditory processing deficits could affect J.V's ability to acquire phonics and understand speech perception, learn structural analysis, spell, learn foreign languages and develop music skills.  (*Id.*).

According to Hine, testing demonstrated that J.V.'s visual-motor perceptual abilities and developmental maturity were low for a child of his age and that his visual perceptual ability was low average for a child of his age.  (*Id.*).  Additionally, Hine administered the Behavior Assessment System for Children Second Edition, which demonstrated that J.V.'s scores varied across the various scales, between average, clinically significant and at-risk on the parent-rating scale, and between average, slightly atypical, moderately atypical and markedly atypical on the teacher rating scale.  (*Id.*).  According to Hine, areas of particular concern included externalizing problems, internalizing problems, behavioral symptoms, adaptive oppositional, cognitive problems and inattention, ADHD index and restless-impulsive index.  (*Id.*).  According to Hine, the areas of concern indicated that J.V. was likely to break rules, have problems with authority and be easily annoyed.  (*Id.*).  Additionally, J.V. was likely to be inattentive, have organizational and concentration problems and have difficulty completing tasks.  (*Id.*).

Hine concluded that J.V. met the special education criteria and that he was unable to make adequate academic growth, despite modifications in his general education curriculum.  (*Id.*).  Hine opined that J.V. met the OHI classification due to his ADHD diagnosis and that he met the LD classification due the fifty percent discrepancy between his cognitive abilities and his academic skills across several areas.  (*Id.*).  Further, Hine assessed that J.V. suffered from processing deficits in visual-motor integration, auditory word discrimination, auditory memory, auditory comprehension and auditory reasoning.  (*Id.*).

Hine recommended that CSE review J.V's psychoeducational evaluation to determine whether he meets the criteria for an educationally-handicapping condition and determine the most appropriate educational placement. (*Id.*). Hine also recommended specific classroom strategies to assist J.V. in a classroom setting. (*Id.*).

On October 7, 2005, Hine added an addendum to J.V.'s psychological evaluation, noting that J.V. was repeating the first grade during the 2005-2006 school year and that his report card from the 2004-2005 school year had demonstrated that he was performing far below academic standards and was only partially meeting standards in reading, counting, writing and manipulating numbers. (Tr. 382-84). Again, Hine noted that J.V.'s Verbal IQ was in the borderline range and that his Performance IQ was in the average range. (*Id.*). According to Hine, although J.V.'s Full Scale IQ was within the low average range, the twenty-two point discrepancy between his verbal and non-verbal skills was notable. (*Id.*). Additionally, Hine observed that J.V. demonstrated high impulsivity and distractibility. (*Id.*). Hine continued to recommend that CSE review J.V's psychoeducational evaluation to determine whether he meets the criteria for an educationally handicapping condition and to determine the most appropriate educational placement for J.V. (*Id.*). Hine also recommended specific classroom strategies to assist J.V. in a classroom setting. (*Id.*).

E.   **Christine Ransom, PhD**

On November 13, 2007, state examiner Christine Ransom ("Ransom"), PhD, conducted a psychiatric evaluation of J.V. (Tr. 516-19). J.V. was accompanied by Vazquez. (*Id.*). At the time of the evaluation, J.V. lived with his mother and younger brother. (Tr. 516). J.V. was reportedly attending the third grade in special education classes. (*Id.*). Vazquez reported that J.V. had been receiving counseling services relating to his ADHD at Crestwood for

the past six months and that he received prescription medication from his pediatrician. (*Id.*).

According to Vazquez, J.V. had shown improvement with medication and was doing well at

school, although he experienced verbal outbursts. (*Id.*). Vazquez denied that J.V. suffered from

attention, concentration or hyperactivity impairments, or that he had depression, anxiety or

thought disorder. (*Id.*). J.V. was able to care for his personal hygiene at age-appropriate levels

and was able to assist with household chores, although he sometimes needed reminders. (*Id.*).

Additionally, J.V. enjoyed playing with his friends, although he sometimes got into arguments.

(*Id.*).

Upon examination, Ransom noted that J.V. appeared neatly dressed with adequate

grooming and hygiene. (*Id.*). Ransom opined that J.V. had fluent and intelligible speech with

expressive and receptive language skills, coherent and goal-directed thought processes, full range

affect appropriate to speech and thought content, clear sensorium, full orientation, fair insight

and judgment, and average intellectual functioning with a general fund of information that was

appropriate to experience. (*Id.*). Ransom noted that J.V.'s attention and concentration were

intact. (*Id.*). According to Ransom, J.V. could count backwards and perform simple

calculations, and he demonstrated appropriate attention throughout the exam. (*Id.*). Ransom

found J.V.'s immediate memory was intact. (*Id.*). He could recall three out of three objects

immediately, three out of three objects after five minutes and could complete three digits forward

and three digits backward. (*Id.*).

According to Ransom, J.V. had mild to moderate difficulties attending to,

following and understanding age-appropriate directions, completing age appropriate tasks,

adequately maintaining appropriate social behavior, responding appropriately to changes in the

environment, learning in accordance with cognitive functioning, asking questions and requesting

assistance in an age-appropriate manner, being aware of danger and taking needed precautions, and interacting adequately with peers and adults. (*Id.*). According to Ransom, J.V.'s areas of difficulty were due to ADHD, currently mild to moderate with moderate symptoms in the school setting. (*Id.*).

On April 12, 2010, Ransom conducted another psychiatric evaluation of J.V. (Tr. 605-08). Again, J.V. was accompanied by Vazquez. (*Id.*). At the time of the evaluation, J.V. continued to live with his mother and younger brother. (Tr. 516). J.V. was reportedly attending the fifth grade in special education classes. (*Id.*). Vazquez reported that J.V. had been receiving counseling services at Crestwood, but the family lacked transportation to the facility. (*Id.*). J.V. was currently receiving treatment for ADHD at GMHC, including therapy and medication management. (*Id.*). According to Vazquez, J.V. was having difficulty learning in school, although his ADHD medication was working "great." (*Id.*). Vazquez denied that J.V. suffered from general behavior problems, attention, concentration or hyperactivity impairments or that he had depression, anxiety or thought disorder. (*Id.*). J.V. was able to care for his personal hygiene at age-appropriate levels, assist with household chores when requested and enjoyed playing with his friends. (*Id.*).

Upon examination, Ransom noted that J.V. appeared neatly dressed with adequate grooming and hygiene. (*Id.*). Ransom opined that J.V. had fluent and intelligible speech with expressive and receptive language skills that were below age level, coherent and goal-directed thought processes, full range affect appropriate to speech and thought content, clear sensorium, full orientation and age appropriate insight and judgment. (*Id.*). According to Ransom, J.V.'s intellectual functioning appeared to be within the borderline to mentally retarded range with a limited general fund of information. (*Id.*). Ransom noted that J.V.'s attention and concentration

was intact.  (*Id.*).  According to Ransom, J.V. could count backwards from twenty and perform

simple calculations, and he demonstrated appropriate attention throughout the exam.  (*Id.*).

Ransom found J.V.'s immediate memory to be mildly to moderately impaired.  (*Id.*).  He could

recall one out of three objects immediately and could complete three digits forward and two

digits backward.  (*Id.*).  Additionally, Ransom found J.V.'s recent memory to be moderately

impaired as he could remember one out of three objects after five minutes.  (*Id.*).

According to Ransom, J.V. had mild difficulties attending to, following and

understanding age-appropriate directions, completing age appropriate tasks, responding

appropriately to changes in the environment, asking questions and requesting assistance in an

age-appropriate manner, assessing danger and taking needed precautions, and interacting

adequately with peers and adults.  (*Id.*).  Further, Ransom opined that J.V. was able to adequately

maintain appropriate social behavior, learn in accordance with cognitive functioning, and interact

adequately with peers and with adults.  (*Id.*).  According to Ransom, J.V.'s areas of difficulty

were secondary to probable borderline to mentally retarded intellectual functioning.  (*Id.*).

### F.    M. Morog, Psychology

On January 8, 2008, agency medical consultant Dr. M. Morog ("Morog")[6]

completed a Childhood Disability Evaluation.  (Tr. 520-25).  Morog concluded that J.V. suffered

from a severe impairment or combination of impairments, but opined that his impairments did

not meet or equal a listed impairment.  (*Id.*).  Morog opined that J.V. suffered from marked

limitation in his ability to attend and complete tasks.  (*Id.*).  In addition, Morog opined that J.V.

suffered from less than marked limitations in his ability to acquire and use information and in his

health and physical well-being.  (*Id.*).  Morog assessed that J.V. did not suffer from any

---

[6] Morog was the agency consultant with the overall responsibility for the assessment, although a pediatrician was also consulted in formulating the assessment.  (Tr. 525).

limitations in his ability to interact and relate with others, move about and manipulate objects and care for himself. (*Id.*).

### G.    **K. Prowda, Psychiatry**

On April 20, 2010, agency medical consultant Dr. K. Prowda ("Prowda") completed a Childhood Disability Evaluation. (Tr. 609-14). Prowda concluded that J.V. suffered from a severe impairment or combination of impairments, but opined that his impairments did not meet or equal a listed impairment. (*Id.*). Prowda opined that J.V. suffered from marked limitation in his ability to attend and complete tasks. (*Id.*). In addition, Prowda opined that J.V. suffered from less than marked limitations in his ability to acquire and use information and interact and relate with others. (*Id.*). Prowda assessed that J.V. did not suffer from any limitations in his ability to move about and manipulate objects and care for himself and in his health and physical well-being. (*Id.*).


### IV.    **Proceedings before the ALJ**

At the administrative hearing, J.V. testified that he was twelve years old and attending the seventh grade. (Tr. 53). According to J.V., his grades were good, although he was not able to describe the types of grades he had received. (Tr. 53-54). J.V. testified that he does well in math and is able to count change and tell time, but that he struggles with reading. (Tr. 57). According to J.V., he has problems with reading because he does not know the words. (Tr. 57-58). J.V. testified that he has problems paying attention at school and frequently plays with his pencil or talks to his friends. (*Id.*). J.V. testified that he is able to get along with other students and teachers and participates in the school chorus. (Tr. 54). According to J.V., he has not been suspended. (*Id.*).

J.V. testified that he has friends outside of school with whom he rides bikes and plays video games.  (Tr. 55-56).  According to J.V., one of his friends is ten years old and the other is seven.  (Tr. 59).  J.V. testified that he lives with his younger brother and does not get along with him.  (*Id.*).  J.V. testified that he hits his younger brother and then is punished.  (*Id.*).  J.V. understood that he was participating in a hearing, but did not know the purpose of the hearing.  (Tr. 56-57).

Vazquez also testified during the hearing.  (Tr. 63-73).  According to Vazquez, J.V. was entering the seventh grade in special education classes and had previously repeated the first grade.  (Tr. 63).  According to Vazquez, J.V.'s school grades were not very good.  (Tr. 64).  Vazquez testified that J.V. was enrolled in special education classes because of his reading skills and his difficulty concentrating in class.  (Tr. 63).  According to Vazquez, the school contacts her approximately three times a week with reports that J.V. is misbehaving in class and distracting the other students.  (*Id.*).  In addition, according to Vazquez, J.V. experiences problems on the school bus and was suspended approximately three times the previous year for bullying other students.  (*Id.*).

Vazquez testified that J.V. attends therapy sessions every two weeks and meets with a doctor monthly to review his medications.  (Tr. 64).  According to Vazquez, she has difficulty ensuring that J.V. keeps his appointments because the Medicaid transport cab does not permit her to accompany J.V., and she does not like to send him to the appointments alone.  (Tr. 65).  Vazquez testified that J.V. has been taking medication since 2004 or 2005 and that his medication typically changes every three months.  (Tr. 65-66).  According to Vazquez, J.V.'s current medications keep him controlled and are generally effective.  (Tr. 66-67).  Vazquez also expressed concern about J.V.'s continued bed-wetting.  (*Id.*).

Vazquez testified that J.V. does not get along with his younger brother and that J.V. frequently starts fights with or hits his brother.  (Tr. 68).  According to Vazquez, she is afraid to leave J.V. alone with his younger brother.  (Tr. 68-69).  Additionally, Vazquez testified that J.V. sometimes hits, pushes and grabs his friends.  (Tr. 71-72).  Vazquez testified that J.V. does not always listen to her instructions and experiences short bouts of anger.  (Tr. 69).  According to Vazquez, J.V.'s moods change quickly and he attends therapy to address his anger.  (Tr. 69-70).  According to Vazquez, J.V. gets very angry and sometimes hits the wall, but does not become physically aggressive towards her.  (Tr. 69, 72-73).  Vazquez testified that J.V. once attempted to burn her dresser.  (Tr. 70, 72-74).

## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("[i]t is not our function to determine *de novo* whether [plaintiff] is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A child is disabled for the purposes of SSI if he or she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). When assessing whether a claimant is disabled, the ALJ must employ a three-step sequential analysis. *See Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384, 386 (2d Cir. 2010). The three steps are:

(1)   whether the child is engaged in substantial gainful activity;

(2) whether the child has a medically determinable impairment that is severe such that it causes more than minimal functional limitations; and

(3) whether the child's impairments medically equal or functionally equal a presumptively disabling condition listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations.

*See id.* (citing 20 C.F.R. § 416.924(b)-(d)).

In determining whether a child's impairment functionally equals a listed impairment, the ALJ must evaluate the child's functioning across the following six domains of functioning:

(1) acquiring and using information;

(2) attending and completing tasks;

(3) interacting and relating with others;

(4) moving about and manipulating objects;

(5) caring for oneself; and

(6) health and physical well-being.

*See id.* (citing 20 C.F.R. § 416.926a(a)).  To be functionally equivalent, the impairment must result in a finding of "extreme" functional limitations in at least one domain or a finding of "marked" functional limitations in at least two domains.  *See id.*

A "marked" limitation is one that is "more than moderate but less than extreme" and that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(2)(i); *see also Spruill ex rel. J.T. v. Astrue*, 2013 WL 885739, *5 (W.D.N.Y. 2013) ("[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the child's] ability to function independently, appropriately,

effectively, and on a sustained basis") (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)).

Generally, a "marked" limitation is the equivalent of functioning resulting in scores on

standardized tests that are "at least two, but less than three, standard deviations below the mean."

20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one which "interferes very seriously

with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R.

§ 416.926a(e)(3)(i).

   In his decision, the ALJ followed the required three-step analysis for evaluating

childhood disability claims.  (Tr. 29-42).  Under step one of the process, the ALJ found that J.V.

had never engaged in substantial gainful activity.  (Tr. 32).  At step two, the ALJ concluded that

J.V. has the severe impairments of ADHD, oppositional defiant disorder, and borderline

intellectual functioning.  (*Id.*).  At step three, the ALJ determined that J.V. does not have an

impairment (or combination of impairments) that meets or medically equals one of the listed

impairments.  (*Id.*).  In addition, the ALJ concluded that J.V. did not have an impairment (or

combination of impairments) that functionally equaled one of the listed impairments.

(Tr. 32-42).  In reaching this conclusion, the ALJ evaluated J.V.'s impairments across the six

domains of functioning.  Specifically, the ALJ concluded that J.V. suffered from marked

limitations in the domain of attending and completing tasks and less than marked limitations in

the domains of acquiring and using information and interacting and relating with others.  (*Id.*).

In addition, the ALJ concluded that J.V. had no limitations in the domains of moving about and

manipulating objects, caring for himself, and health and physical well-being.  (*Id.*).  Accordingly,

the ALJ found that J.V. is not disabled.  (*Id.*).

II.    **Analysis**

In her motion, Vazquez contends that the ALJ erred in determining that J.V. does

not suffer from an impairment or combination of impairments that functionally equal a listed

impairment.[7]  (Docket # 11-1).  Specifically, Vazquez contends that the ALJ erred when he

found that J.V. has "less than marked" limitations in the domains of acquiring and using

information and interacting and relating with others.  (*Id.* at 18-25).  Because Vazquez

challenges only the ALJ's findings as to acquiring and using information and interacting and

relating with others, the Court's analysis addresses these domains of functioning.

A.    **Acquiring and Using Information**

In evaluating the level of impairment in the domain of acquiring and using

information, consideration must be given to how well a child acquires information through their

activities and then applies or uses the information to enable them to perceive relationships,

reason and make logical choices.  20 C.F.R. §416.926a(g)(1).  The regulations provide that

school-age children should be able to learn to read, write and do math, and discuss history and

science.  20 C.F.R. § 416.926(g)(2)(iv).  School-age children should be able to use the skills they

have learned in both academic and nonacademic situations and should be able to demonstrate

what they have learned.  *Id.*  "School-age children should be able to use increasingly complex

language (vocabulary and grammar) to share information and ideas with individuals or groups,

by asking questions and expressing [their] own ideas, and by understanding and responding to

the opinions of others."  *Id.*

Vazquez maintains that the ALJ improperly supported his determination that J.V.

suffered from less than marked limitations in this domain by reference to J.V.'s IQ scores and the

---

[7]  Vazquez does not challenge the ALJ's conclusion that J.V.'s impairments do not meet any particular
listing.  (Docket # 11-1 at 17 n.30).

non-examining agency consultant's opinion, which relied exclusively upon J.V.'s IQ scores.  (*Id.* at 18-20).   Additionally, Vazquez contends that the ALJ failed to adequately account for the limitations assessed in Riley's evaluation and did not consider how J.V.'s other impairments might affect his ability to learn.  (*Id.* at 20-23).   After a review of the record, I conclude that the ALJ failed to justify his findings with any evidence other than J.V.'s testing scores and that his determination that J.V. suffered from less than marked limitations in this domain is not supported by substantial evidence.  *See Stanley v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 382, 395 (N.D.N.Y. 2014) ("the ALJ's finding of less than marked limitation is not supported by substantial evidence").

As an initial matter, I agree with Vazquez that the only basis articulated by the ALJ in support of his conclusion that J.V. suffered from less than marked limitations in this domain were J.V.'s "low average" IQ scores.  In his decision, the ALJ recounted record information suggesting that J.V. suffered from some limitations in the domain of acquiring and using information, including his placement in special education classes due to his learning disability and OHI, a psychologist's assessment that he suffered from processing deficits, and his IEP reviews that continued to indicate significant attention, reading fluency and comprehension delays.  (Tr. 35-36).

Despite this information, the ALJ concluded that J.V. suffered from less than marked limitations, noting that his Full Scale IQ was 88 and that Prowda had opined that J.V. had less than marked limitations.  (*Id.*).  Prowda's opinion of less than marked limitations, however, is based solely upon J.V.'s IQ scores.  (Tr. 611).  "Although [a claimant's IQ] scores may not be low enough to meet the clinical definition of mental retardation, this does not mean the [c]laimant has less than marked impairment with respect to acquiring and using information."

33

*Keene ex rel. J.T. v. Astrue*, 901 F. Supp. 2d 339, 349 (N.D.N.Y. 2012) (quoting *Dabul-Montini*

*ex rel. N.D. v. Astrue*, 2010 WL 3584348, *6 (N.D.N.Y.), *report and recommendation adopted*,

2010 WL 3584289 (N.D.N.Y. 2010)).  The domain of acquiring and using information

"considers more than just assessments of cognitive ability as measured by intelligence tests,

academic achievement instruments, or grades in school."  *Dabul-Montini ex rel. N.D. v. Astrue*,

2010 WL 3584348 at *6 (quoting Social Security Ruling 09-3p, 2009 WL 396025, *2 (2009)).

Given the evidence suggesting that, despite his "low average" IQ scores,[8] J.V. was limited in his

ability to progress academically, I conclude that his IQ scores alone do not constitute substantial

evidence supporting the ALJ's determination of less than marked impairments.  *See Keene ex rel.*

*J.T. v. Astrue*, 901 F. Supp. 2d at 349 ("[h]ere, the [ALJ] did not justify his findings with any

evidence beyond the testing scores, and he made no attempt at all to reconcile contrary

evidence"); *Dabul-Montini ex rel. N.D.*, 2010 WL 3584348 at *6; *Carballo ex rel. Cortes v.*

*Apfel*, 34 F. Supp. 2d 208, 218 (S.D.N.Y. 1999) ("[a] child of normal intelligence can also be

cognitively impaired if some condition other than a low IQ severely affects the child's ability to

progress in the skills involved in reading, writing and arithmetic"); *McClain v. Apfel*, 2001 WL

66403, *15 (S.D.N.Y.) ("marked impairments in the area of cognition and communication may

exist were a child is of normal intelligence but suffers from severe learning disabilities"), *report*

*and recommendation adopted as modified on other grounds*, 2001 WL 619177 (S.D.N.Y. 2001).

Further, the ALJ failed to evaluate significant evidence in the record suggesting

that J.V. suffered from substantial impairments in this domain and did not provide good reasons

for his decision to reject the limitations identified by Riley in favor of the opinion offered by

---

[8]  As noted by plaintiff, Hine described J.V.'s intelligence as falling within the "low average range," but specifically noted a twenty-two point discrepancy between his verbal and non-verbal skills.  According to Hine, J.V.'s "abilities cannot be accurately summarized by a single score," and his "his nonverbal reasoning abilities are much better developed than his verbal comprehension and reasoning abilities" – a disparity "likely to be noticeable in the variability of his performance across classroom and other activities that tap these abilities."  (Tr. 383, 387).

Prowda, the non-examining, consultative physician.  In evaluating a child's level of impairment, the ALJ should "consider all relevant evidence in determining a child's functioning," including information from the child's teachers or from therapists.  *Swan v. Astrue*, 2010 WL 3211049, *6 (W.D.N.Y. 2010); *Yensick v. Barnhart*, 245 F. App'x 176, 181 (3d Cir. 2007) ("[t]he ALJ may also consider other opinions about a claimant's disability from persons who are not deemed 'acceptable medical sources,' such as a therapist who is not a licensed or certified psychologist"). Evidence from teachers or therapists "cannot establish the existence of a medically determinable impairment," but their opinions may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  *See* Social Security Ruling 06-03P, 2006 WL 2329939, *2 (2006).

Social Security Ruling 06-03P recognizes that "[n]on-medical sources who have had contact with the individual in their professional capacity, such as teachers . . . who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning[;] [o]ften, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  *Id*.  In evaluating evidence supplied by sources such as teachers or therapists, the ALJ should consider:

(1)   how long the source has known and how frequently the source has seen the individual;

(2)   how consistent the opinion is with other evidence;

(3)   the degree to which the source presents relevant evidence to support an opinion;

(4)   how well the source explains the opinion;

(5)   whether the source has a specialty or area of expertise related to the individual's impairment(s); and

(6)   any other factors that tend to support or refute the opinion.

*Id.* at *4-5.

In this case, the ALJ rejected Riley's conclusions that J.V. suffered from "very serious problems" in this domain on the grounds that "the evidence as a whole fails to support a finding that [J.V.] has a marked or extreme limitation in this domain."  (Tr. 35).  In his discussion of this domain, however, the ALJ failed to identify sufficient evidence demonstrating that Riley's conclusions were unsupported.  Indeed, as discussed above, other than the "low average" IQ scores, the evidence articulated by the ALJ with respect to this domain appears consistent with Riley's observations that J.V. suffered from significant limitations in his ability to acquire and use information.  Although the determination of the appropriate weight to be accorded to opinions of record lies with ALJ, the ALJ has an obligation to explain his decision to assign limited weight to the opinions of a claimant's teachers "who [have] had extensive, first-hand opportunities to observe [c]laimant and assess his limitations."  *Stanley v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d at 395 ("[w]hile the ALJ is not required to reconcile every shred of evidence, the ALJ must acknowledge relevant evidence and explain his rejection of such evidence") (quoting *Walker ex rel. J.B. v. Astrue*, 2010 WL 2287566, *15 (N.D.N.Y. 2010)); *see Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199-200 (2d Cir. 2010) (remanding for further proceedings where the ALJ failed "adequately to explain his determination not to credit the opinion of . . . plaintiff's treating physician"[;] . . . the ALJ's incantatory repetition of the words 'substantial evidence' gives us no indication at all of why he chose to credit the opinions of the consulting physicians over that of [the treating physician]"); *Baez ex rel. D.J. v. Colvin*, 2014 WL 1311998, *11 (N.D.N.Y. 2014) ("on remand, the ALJ should consider and articulate all relevant factors in evaluating the opinion of [claimant's teacher], and absent a legitimate reason

to discredit her opinion, should re-evaluate each domain, weighing the impact of her opinion as it affects his determination of substantial evidence"); *Rossi v. Comm'r of Soc. Sec.*, 2010 WL 5313771, *9 (N.D.N.Y.) (remanding for further proceedings where "[t]he ALJ failed to reconcile the teacher's findings with other, more positive evidence in the educational records, upon which the ALJ selectively relied"), *report and recommendation adopted*, 2010 WL 5325633 (N.D.N.Y. 2010); *Dabul-Montini ex rel. N.D.*, 2010 WL 3584348 at *7 ("although [the ALJ] referenced the findings of [claimant's teacher] in his general discussion of the evidence . . . , the ALJ made no attempt to reconcile [the teacher's] dramatic findings with his 'less than marked limitation' assessment"); *Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 178 (N.D.N.Y. 2010) ("[t]he ALJ provided no rationale for rejecting the opinions of claimant's classroom teachers, special education teachers and school psychologist in favor of the non-examining, consultative physician"); *Edmond v. Barnhart*, 2006 WL 2769922, *10 (W.D.N.Y. 2006) ("the ALJ erred by not considering the report of [claimant's] teacher in making his determination that [claimant] has only a marked limitation in the domain of acquiring and using information").  In this case, I conclude that the ALJ failed to "justify his decision to [accord] greater weight to the non-examining consultant than was given to the report[] provided by [Riley], who had extensive, first-hand opportunities to observe [J.V.] and assess his limitations."  *See Stanley*, 32 F. Supp. 3d at 395.

Moreover, the ALJ failed to address significant evidence in the record that J.V. continued to have substantial limitations in his ability to progress academically.  J.V. had to repeat the first grade because he was performing significantly below grade level.  (Tr. 382-98). According to Hine, J.V. was performing far below academic standards and was only partially meeting standards in reading, counting, writing and manipulating numbers.  (*Id.*).  J.V.'s IEP

reviews reveal that he continued to struggle academically throughout grades two through six, particularly in reading comprehension, and that he required information to be presented orally. (Tr. 298-304, 346-53, 367-73, 565-73, 574-80).  Further, testing performed in 2008 suggests that J.V. continued to perform below grade level in reading comprehension, word reading and written expression.  (Tr. 577).  According to the IEP reviews, J.V. continued to read far below grade level despite his participation in corrective reading programs designed to advance his reading skills.  (Tr. 298-304).  In fact, although the ALJ noted that J.V.'s most current IEP stated that he had "significant delay in attentional skills, reading fluency, and comprehension which negatively impact him in all academic areas," the ALJ made no attempt to reconcile this information with his conclusion that J.V. only suffered from less than marked limitations in this domain.  (Tr. 36). The evidence, which was not adequately discussed by the ALJ, supports Riley's conclusions that J.V. suffered from significant limitations in this domain.

Having reviewed the record, I conclude that there is substantial evidence demonstrating J.V.'s limitations, particularly considered in light of Riley's assessment that J.V. suffered from significant problems in the domain, which compels the conclusion that J.V. has a marked limitation in the domain of acquiring and using information.  *See St. Louis ex rel. D.H. v. Comm'r of Soc. Sec.*, 28 F. Supp. 3d 142, 153 (N.D.N.Y. 2014) ("when the very great evidentiary weight . . . is accorded to [the teacher's] opinions about [claimant's] marked and extreme difficulties with many activities related to acquiring and using information, a finding that [claimant] has a marked limitation in this domain is required"); *Stanley*, 32 F. Supp. 3d at 394-95 (substantial evidence in the record, including teacher questionnaires and medical opinions demonstrated that claimant suffered from marked limitations in domain of acquiring and using information); *Myers ex rel. C.N. v. Astrue*, 993 F. Supp. 2d 156, 166-67 (N.D.N.Y.

2012) (record evidence, including claimant's below-grade level performance and teacher

questionnaires indicating "very serious" and "serious" problems in activities associated with

domain demonstrated that claimant suffered from marked limitations in domain of acquiring and

using information).

B.     **Interacting and Relating with Others**

In evaluating the level of impairment in the domain of interacting and relating

with others, consideration must be given to "how well the child initiates and sustains emotional

connections with others, develops and uses the language of [his] community, cooperates with

others, complies with the rules, responds to criticism, and respects and takes care of the

possessions of others."  *Dayton v. Astrue*, 2012 WL 4711988, *5 (N.D.N.Y. 2012) (citing 20

C.F.R. § 416.926a(i)).  The regulations provide that school-age children should be able to

develop more lasting friendships with children their own age, begin to work in groups to create

projects and solve problems, demonstrate an increasing ability to understand another's point of

view and to tolerate differences and talk to people of all ages.  20 C.F.R. § 416.926a(i)(2)(iv).

Vazquez maintains that the ALJ supported his determination that J.V. suffered

from less than marked limitations in this domain by selectively citing favorable evidence in the

record and by improperly discrediting Vazquez's testimony.  I disagree.  In reaching his

conclusion that J.V. suffered from less than marked limitations in this domain, I conclude that

the ALJ properly considered the evidence contained in J.V.'s school and treatment records,

Vazquez's testimony and the results of the consultative examination conducted by Ransom.

Specifically, the ALJ recounted Vazquez's testimony that J.V. suffered from

some behavioral problems at school and that he frequently fights with his brother and younger

friends, including engaging in physical altercations.  (Tr. 39).  Additionally, the ALJ recognized

that although Riley had identified many serious problems in this domain, other evidence in the record suggested that J.V.'s limitations within this domain were not as significant.  (Tr. 38).  For example, the ALJ noted that J.V.'s IEP reviews generally described no significant problems interacting with peers and adults.  (Tr. 38-39).  Additionally, the ALJ noted that Ransom had identified only mild to moderate problems maintaining socially appropriate behavior.  (Tr. 39).  With respect to Vazquez's credibility, the ALJ noted that Vazquez had reported to Ransom that J.V.'s behavior improved when he took his medication and that during the April 12, 2010 examination, Vazquez denied that J.V. suffered from behavioral problems.  (*Id.*).  Additionally, although not specifically discussed by the ALJ, Ransom opined in her 2010 consultative examination, which the ALJ accorded "significant weight," that J.V. was "able to adequately maintain appropriate social behavior . . . [and] interact adequately with peers and with adults." (Tr. 607).  Her conclusions are supported by Prowda's assessment that J.V. suffered less than marked limitations in the domain of interacting and relating with others.  (Tr. 611).  These opinions provide further support for the ALJ's conclusion regarding this domain.

After recounting and weighing the conflicting evidence, the ALJ concluded that although J.V. suffered from some limitations in this domain, the limitations were less than marked.  (Tr. 39).  Although the ALJ could have more fully explained his evaluation of the conflicting evidence with respect to this domain, his decision as a whole demonstrates that he considered the relevant evidence, and substantial evidence supports his conclusion that J.V.'s limitations were less than marked.  *See Johnson ex rel. A.J. v. Astrue*, 2013 WL 1187436, *14 (S.D.N.Y. 2013) ("[i]f, as here, the ALJ's decision was based on substantial evidence, and correct legal principles were applied, this [c]ourt must affirm the Commissioner's final decision even if the record contains contrary evidence"); *Frye ex rel. A.O. v. Comm'r of Soc. Sec.*, 2010

WL 6426346, *9 (N.D.N.Y. 2010) ("[t]he ALJ could have more clearly explained how he reconciled the seemingly mixed evidence regarding the extent of claimant's limitations in this domain[;] [h]owever, he properly referenced the evidence on both sides of the issue and marshaled substantial evidence supporting his conclusion that [the child's] limitations were less than marked").

## C.   <u>Remand</u>

I turn now to the question of whether the required remand should be for the calculation of benefits or for further development of the record.

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the cause for a rehearing.'" *Butts v. Barnhart*, 388 F.3d at 385 (quoting 42 U.S.C. § 405 (g)).  "Remand is appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *McGregor v. Astrue*, 993 F. Supp. 2d 130, 145 (N.D.N.Y. 2012) (internal quotations omitted).  In contrast, where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," a remand for calculation of benefits, as opposed to further fact gathering, is appropriate.  *See Butts*, 388 F.3d at 385-86 (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)).

Having reviewed the record, I determine that the record is complete and that further proceedings "would serve no productive purpose, would not produce findings contrary to this Court's conclusions, and would only cause further delay." *Dabul-Montini ex rel. N.D.*, 2010 WL 3584348 at *12.  At the time this action was commenced, J.V.'s application for benefits had been pending for almost six years.  While "[d]elay . . . is harmful for any litigant, [it is]

particularly [harmful] in connection with benefits for children, which are not to replace lost

income, but to enable low-income families to afford special education, medical treatment,

physical rehabilitation, early intervention services, and personal needs assistance for the child."

*Nieves ex rel. Nieves v. Barnhart*, 2004 WL 2569488, *10 (S.D.N.Y. 2004), *amended on*

*reconsideration on other grounds*, 2005 WL 668788 (S.D.N.Y. 2005).  As discussed above, the

record contains persuasive evidence that J.V. suffers from marked limitations in the domain of

acquiring and using information.  Further, neither party disputes the ALJ's conclusion that J.V.

suffers from a marked limitation in the domain of attending and completing tasks.  Accordingly,

a finding of disability is warranted, and the matter should be remanded solely for the calculation

of benefits.  *See St. Louis ex rel. D.H. v. Comm'r of Soc. Sec.*, 28 F. Supp. 3d at 153 (remanding

for calculation of benefits where the record contained persuasive proof that claimant suffered

from marked limitations in two domains of functioning); *White ex rel. Johnson v. Barnhart*, 409

F. Supp. 2d 205, 209 (W.D.N.Y. 2006) (remanding for calculation of benefits; "when [] all the

pertinent evidence is accorded its proper weight and the regulations are applied correctly, the

record compels only one conclusion").


## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the

pleadings (**Docket # 12)** is **DENIED**, and Vazquez's motion for judgment on the pleadings

**(Docket # 11)** is **GRANTED**.  This matter is remanded to the Commissioner for calculation and payment of benefits.

**IT IS SO ORDERED.**


_____
_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge


Dated:  Rochester, New York
        March 18, 2015